PUBLISHED

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

HESS ENERGY, INCORPORATED,
          *Plaintiff-Appellant,*

v.                                                    No. 01-1582

LIGHTNING OIL COMPANY, LIMITED,
          *Defendant-Appellee.*

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
James C. Cacheris, Senior District Judge.
(CA-00-1347-A)

Argued: December 3, 2001

Decided: January 18, 2002

Before WILKINSON, Chief Judge, NIEMEYER, Circuit Judge,
and Joseph R. GOODWIN, United States District Judge for the
Southern District of West Virginia, sitting by designation.

Reversed and remanded by published opinion. Judge Niemeyer wrote
the opinion, in which Chief Judge Wilkinson and Judge Goodwin
joined.

## COUNSEL

**ARGUED:** Daniel M. Joseph, AKIN, GUMP, STRAUSS, HAUER
& FELD, L.L.P., Washington, D.C., for Appellant. Joseph E. Alto-
mare, Titusville, Pennsylvania, for Appellee. **ON BRIEF:** Anthony
T. Pierce, Michael L. Converse, Kelly M. Skoloda, AKIN, GUMP,

STRAUSS, HAUER & FELD, L.L.P., Washington, D.C., for Appellant.

---

**OPINION**

NIEMEYER, Circuit Judge:

Upon Hess Energy, Inc.'s complaint against Lightning Oil Company, Ltd., which demanded damages for breach of a natural gas supply contract, the district court granted summary judgment to Lightning. The court found that Hess Energy, by assigning administrative responsibilities to its parent company, violated the supply contract's assignment-limitation provision, thereby justifying Lightning's nonperformance. We conclude that if an improper assignment of contract obligations occurred, it was not material and therefore did not justify Lightning's nonperformance. Accordingly, we reverse and remand for a determination of Hess Energy's damages.

I

Lightning and Statoil Energy Services, Inc. entered into a Master Natural Gas Purchase Agreement ("Master Agreement") on November 1, 1999, under which Lightning agreed to supply natural gas to Statoil. The amounts and prices for particular deliveries of natural gas were established by negotiated individual confirmation contracts entered into in accordance with the Master Agreement. The arrangement was to last one year, after which it was to continue from month to month until terminated by either party after 30-days' notice. But the Master Agreement could not be terminated "before the expiration of any existing Confirmation [contract]."

Between November 16, 1999, and March 7, 2000, Statoil made seven purchases under the Master Agreement, each of which was duly governed by a confirmation contract stating the terms of the particular transaction and signed by both parties. The confirmation contracts obligated Lightning to supply natural gas to Statoil in specified volumes and prices and over specified periods, the latest extending to March 31, 2002.

On February 22, 2000, Statoil's parent company consummated a stock purchase agreement with Amerada Hess Corporation to sell the stock of Statoil to Amerada Hess. Following this stock purchase, Statoil's corporate name was changed to Hess Energy, Inc., and Amerada Hess became involved in the administration of Hess Energy's purchases of natural gas from Lightning under the Master Agreement.

For approximately three months, Lightning appeared to have no problem with Amerada Hess' involvement in the administration of the confirmation contracts between Lightning and Hess Energy. On May 11, 2000, Lightning submitted its April invoice for the natural gas delivered in April 2000 to "Amerada Hess" at the Pennsylvania address designated in the Master Agreement for correspondence with Statoil, and on May 24 Amerada Hess paid this invoice by wire transfer. Thereafter, on May 25, 2000, Amerada Hess notified Lightning, consistent with Article XIV of the Master Agreement, that Hess Energy's correspondence address was changed to that of Amerada Hess' Alexandria, Virginia office. After receiving that notice, Lightning sent its invoices for the natural gas delivered in May and June 2000 to the Virginia address, and again Amerada Hess timely paid both invoices.

At Lightning's request, on May 31, 2000, Lightning met with Amerada Hess to discuss terms for future natural gas purchases. When the parties were unable to agree on prices, they openly considered the possibility of Lightning finding another customer for its natural gas. In response to this discussion, Amerada Hess faxed a letter to Lightning that same day in which it stated that Amerada Hess and Lightning "have mutually agreed to terminate the [Master Agreement] effective October 31, 2000" but that existing confirmation contracts would remain in effect. Lightning answered this fax by its own fax on June 1, 2000, stating that there had been no agreement to terminate the Master Agreement and expressing the belief that there "was some misunderstanding" because there had merely been a "proposal" by Amerada Hess to terminate the contract.

A few days later, however — on June 7, 2000 — Lightning signed a contract with Natural Fuel Resources, Inc., an unrelated third party, to sell the natural gas that it had previously committed to Hess Energy. And on June 23, 2000, Lightning and Natural Fuel Resources

signed a Base Contract for Short Term Sale and Purchase of Natural Gas, covering the period July 2000 to March 2002. Lightning acknowledged that its purpose in signing this contract with Natural Fuel Resources was to obtain a better price than it had obtained from Hess Energy.

On July 26, 2000 (one week after Amerada Hess paid Lightning's July 11 invoice for natural gas delivered in June), Hess Energy received a letter from Lightning (addressed to Statoil), stating that Lightning was terminating the Master Agreement, effective June 30, 2000, because Statoil (Hess Energy) had improperly assigned its contract obligations to Amerada Hess, its parent company, in violation of the Master Agreement. Although this letter was dated June 7, 2000, it was not postmarked until July 25.

Hess Energy then commenced this action against Lightning, seeking a declaratory judgment that it was not in breach of any contract with Lightning and demanding compensatory damages for Lightning's nonperformance in breach of the confirmation contracts. In its answer, Lightning stated that its termination of the Master Agreement and confirmation contracts was justified because Hess Energy had assigned some of its duties and obligations under the contract to Amerada Hess, in violation of Article XI of the Master Agreement. Article XI provides:

> Neither Party shall assign this Agreement or any of its rights, duties or obligations hereunder unless it shall have first obtained the consent in writing of the other Party hereto, which shall not be unreasonably withheld or delayed, provided however that either Party may without the consent of the other Party, . . . transfer or assign this Agreement to any successor, representative or assignee which shall succeed by purchase, merger or consolidation to the properties, substantially as an entirety, of Seller [Lightning] or Buyer [Statoil], as the case may be.

Lightning asserted that Hess Energy's breach of Article XI justified its discontinuing delivery of natural gas under the confirmation contracts.

After discovery, Hess Energy filed a motion for summary judgment, arguing that Lightning had admitted the prima facie elements for Hess Energy's breach-of-contract claim and that Hess Energy had made no assignment forbidden by the Master Agreement. In the alternative, Hess Energy argued that any alleged breach was not material. In a cross-motion for summary judgment, Lightning claimed that Amerada Hess' purchase of Statoil's stock and its subsequent administration of the Master Agreement evidenced an assignment in material breach of Article XI (the assignment-limitation provision) of the Master Agreement. The district court denied both motions, concluding that there was a dispute of material fact as to whether Hess Energy had assigned the Master Agreement to Amerada Hess.

Several months later, Lightning renewed its motion for summary judgment, claiming that the undisputed evidence showed that Hess Energy had assigned its responsibility under the Master Agreement to Amerada Hess. This time, the district court concluded that Hess Energy had assigned its responsibilities to Amerada Hess, in violation of Article XI of the Master Agreement, and granted summary judgment to Lightning. The district court pointed to the facts that Amerada Hess paid Hess Energy's invoices; that Amerada Hess had dealt with Lightning in the negotiation of confirmation contracts; and that Amerada Hess, not Hess Energy, had proposed the termination of the Master Agreement on May 31, 2000.

In a motion for reconsideration, Hess Energy argued that new evidence, produced for the first time when Lightning filed its cross-motion for summary judgment, demonstrated that Lightning had waived its right to object to Amerada Hess' involvement. This evidence showed that Lightning had been content to deal with Amerada Hess until it found another customer willing to pay a higher price for its natural gas. Hess Energy argued that Lightning had knowingly done business directly with Amerada Hess for many weeks before suddenly asserting that it objected to the "assignment." The district court rejected Hess Energy's arguments, mainly because they had not been presented earlier.

This appeal followed.

II

Although Article XI of the Master Agreement forbids either party from assigning "any of its rights, duties or obligations" under the Master Agreement without the other party's consent, there is no provision in the agreement making such an assignment an automatic ground for immediate termination of either the Master Agreement or of the confirmation contracts under it. To the contrary, an assignment under certain circumstances is authorized, and any assignment could be made with Lightning's consent, which could not be unreasonably withheld. Accordingly, even if Lightning could establish that there was an improper assignment, termination would be justified only if the assignment resulted in a breach that was material. *See*, *e.g.*, *Neely v. White*, 14 S.E.2d 337, 341 (Va. 1941) ("Before partial failure of performance of one party will excuse the other from performing his contract or give him a right of rescission, the act failed to be performed must go to the root of the contract").

Lightning contends that Hess Energy's alleged assignment "goes to the root of the contract" because it constitutes a breach of Hess Energy's promise "not [to] foist a stranger upon Lightning without its consent." Lightning suggests that *any* assignment is material "because it vitiates the very assent which is necessary to sustain a contract" and takes away Lightning's opportunity "to select and determine with whom [it] will contract." *See generally Arkansas Valley Smelting Co. v. Belden Mining Co.*, 127 U.S. 379 (1888).

But Lightning's basis for arguing that it can choose with whom to contract loses any support value when viewed in the context of this case. As both parties concede, the Master Agreement is no longer in force and no further confirmation contracts can be negotiated under it. All that remains are Hess Energy's damage claims for breach of the seven confirmation contracts. Indeed, several of these confirmation contracts were negotiated and signed, without objection, by a representative of Amerada Hess, who was also an officer of Statoil/Hess Energy. These contracts have been fully negotiated and executed by the parties, and the only performance now required by Hess Energy is the payment of invoices as submitted by Lightning. Amerada Hess has already paid several invoices submitted to Hess Energy without objection from Lightning, and Lightning has not suggested how the

continuation of payment by Amerada Hess on behalf of Hess Energy is material to Hess Energy's performance of the confirmation contracts.

A test for materiality of the alleged breach at issue here is provided by the assignment-limitation clause itself. That clause prohibits only assignments made without Lightning's consent, which consent "shall not be unreasonably withheld." This contractual test of materiality therefore rests on the assignment's reasonableness. Because consent is required unless there is a legitimate reason to withhold consent, it follows that, where there is no legitimate reason to withhold consent, skipping the step of asking for consent does not constitute a material breach. And Lightning has offered no legitimate reason why it should not accept payment from Amerada Hess rather than Hess Energy. Indeed, Amerada Hess is a Fortune 500 company whose credit has not been challenged by Lightning. Nor has its credit been placed in doubt by its payment history in this case. Until the discussions in June about whether Hess Energy was paying Lightning the best price, Lightning was fully satisfied with Amerada Hess' payment conduct.

Even if Lightning had doubts regarding the prospect of receiving payment from Amerada Hess instead of from Hess Energy, terminating the confirmation contracts was not the appropriate remedy under the Uniform Commercial Code, which has been adopted in Virginia. The Code addresses the specific situation where a party's expectations are impaired, as Lightning would have to claim:

> A contract for sale imposes an obligation on each party that the other's expectation of receiving due performance will not be impaired. When reasonable grounds for insecurity arise with respect to the performance of either party the other may in writing demand adequate assurance of due performance and until he receives such assurance may if commercially reasonable suspend any performance for which he has not already received the agreed return.

Va. Code Ann. § 8.2-609(1). The official comment to this section notes further that "[a] seller needs protection not merely against having to deliver on credit to a shaky buyer, but also against having to procure and manufacture the goods, perhaps turning down other cus-

tomers." *Id.* cmt. 1. Thus, Lightning's only justification for becoming concerned with Amerada Hess' making payments in lieu of Hess Energy's making them would have to be based on its dealing with a "shaky buyer," entitling Lightning to demand assurances and to suspend performance until those assurances were provided.

In sum, neither the terms of the Master Agreement nor of the Uniform Commercial Code create grounds for Lightning to terminate the confirmation contracts already negotiated and in force.

While our disposition of this case rests on the assumption, made for discussion purposes, that Lightning could establish that there was an improper assignment, it is not clear that this fact has been demonstrated. The mere transfer of ownership of Statoil stock to Amerada Hess did not constitute an assignment in violation of Article XI. *See*, *e.g.*, *Baxter Healthcare Corp. v. O.R. Concepts, Inc.*, 69 F.3d 785, 788 (7th Cir. 1995) (holding that a transfer of stock ownership does not change a corporation's contractual obligations). Because Statoil remained an independent company, the mere fact that its stock was acquired by Amerada Hess did not change Statoil's obligations under the Master Agreement and under the confirmation contracts. In addition, the fact that Statoil changed its name to Hess Energy had no bearing on its obligations to Lightning. Thus, we are left in search of other actions by Amerada Hess and Hess Energy that might have indicated an assignment.

There was no formal assignment of Hess Energy's rights, obligations or duties to Amerada Hess. Accordingly, the district court's ruling could only have been made by finding, as a matter of fact, that there was a constructive assignment. To this end, the district court noted that Amerada Hess had taken on many of Hess Energy's duties. Amerada Hess, for instance, had apparently paid invoices and had negotiated future contracts, including the possibility of terminating the Master Agreement. But these facts are ambiguous. The individual at Amerada Hess who was involved in these activities was also acting as an officer of Hess Energy. Moreover, the record fails to establish how Amerada Hess and Hess Energy accounted for payments and services between themselves. In addition, there is no evidence to contradict Hess Energy's position that it remained liable on the Master Agreement and confirmation contracts. Amerada Hess was merely

assisting with contract administration. Indeed, with a closer look, the district court might well have been able to conclude that the facts necessary for a constructive assignment had not been presented. But the most it could conclude was that a factual question remained, precluding the entry of summary judgment.

Because we determine that any alleged assignment — considered in the context of the existing, agreed-to confirmation contracts — could not be a material breach of those contracts, we reverse the judgment of the district court and remand for determination of Hess Energy's damages under the confirmation contracts.

*REVERSED AND REMANDED*